UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN BRENNAN,<br><br>　　　　　　Plaintiff,<br>　v.<br><br>THE BOSTON BEER COMPANY, INC.<br><br>　　　　　　Defendant. | COMPLAINT & JURY DEMAND |

# INTRODUCTION

1. Plaintiff John Brennan (hereinafter "Plaintiff" or "Mr. Brennan") brings this Complaint against Defendant, The Boston Beer Company, Inc. (hereinafter "Boston Beer") for: Tortious Interference with Contract & Business Relationships; Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; Unjust Enrichment; and violations of the Massachusetts Consumer Protection Act (M.G.L. c. 93A § 11).

2. Boston Beer has refused to address employees' complaints of the company's toxic work environment; instead, it has required and continues to require that its employees sign an unreasonable and overly broad non-compete agreements which operates, among other onerous and burdensome ways, to restrict them from continuing to work in the craft brewery industry in any capacity.

3. Effectively, this agreement requires employees to accept unfair wages because if they stop working for Boston Beer, their options for new employment are subject to outrageously broad restrictions.

1

## PARTIES

4. Plaintiff John Brennan is a resident of Hillsborough County, New Hampshire where he is domiciled and maintains his citizenship.

5. Defendant, The Boston Beer Company, is an incorporated entity under the laws of Massachusetts, maintaining its citizenship therein, and operates its principal office at One Design Center Place, Suite 850 Boston, Massachusetts, 02210.

6. Upon information and belief, Boston Beer employs sales representatives in Massachusetts, New York, California, Vermont, New Hampshire, Pennsylvania, Delaware, Washington, Oregon, and Ohio.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. 1332(a)(1) as Plaintiff and Defendant are diverse from one another, as citizens of different states, and the matter in controversy exceeds the value of $75,000.

8. Venue is proper in the District of New Hampshire pursuant to 28 U.S.C. 1391(b)(1) as this Complaint is brought in the same judicial district in which the Plaintiff resides and a substantial part of the events or omissions giving rise to this claim arose in this judicial district.

## FACTUAL ALLEGATIONS

9. In January 2019, Mr. Brennan was hired as a "Brewery Representative," an entry-level sales position at Boston Beer; Mr. Brennan's job was to sell beer in a territory that encompassed Manchester, New Hampshire and Northern New Hampshire.

10. As a condition of employment, Mr. Brennan signed an Employment Agreement with Boston Beer, which included the following "covenant not to compete:"

4. **Covenant Not-to-Compete.**

(a) During the period commencing on the date hereof and continuing until the expiration of one (1) year from the date on which the Employee's employment with the Company terminates (the "Restricted Period"), the Employee shall not, without the prior written consent of the Company, which consent the Company may grant or withhold in its sole discretion, directly or indirectly, for his or her own account or the account of others, in any geographic areas in which Employee provided services to the Company, or about which Employee obtained Proprietary Information, during the last two years of his/her employment by the Company, as an employee, consultant, partner, officer, director or stockholder (other than a holder of less than five percent (5%) of the issued and outstanding stock or other equity securities of an issuer whose securities are publicly traded), or otherwise, engage in the importing, production, marketing, sale or distribution to distributors of any beer, malt beverage, hard cider or product produced by the Company at any time during the Employee's tenure with the Company (i) which is either produced outside of the United States and imported into the United States or produced within the United States and ii) which has a wholesale price within twenty-five (25%) of the wholesale price of any of the Company's products, including but not limited to products marketed under the trade names SAMUEL ADAMS, TWISTED TEA, ANGRY ORCHARD, TRULY and such other trade names as the Company may use to market its products during the Employee's employment with the Company.  The Employee acknowledges that he or she has read and understands this provision, and that he or she has agreed to it knowingly and voluntarily, in order to obtain the benefits provided to Employee by the Company.  Notwithstanding the foregoing, in the event that you breach your fiduciary duty to the Company, and/or you have unlawfully taken, physically or electronically, property belonging to the Company, the Restricted Period shall be twenty four (24) months from the date of your employment termination; provided, however, that the additional consideration provided for in paragraph 4(d) hereof shall not exceed the additional consideration set forth in paragraph 4(d) in any event.

(b) The parties agree that Paragraph 4(a) hereof shall not apply to Employee (i) if Employee is a non-exempt employee of the Company on the date of termination, and/or (ii) if his or her employment by the Company is terminated by the Company without cause, or pursuant to a reduction in force.

(c) As used herein, the term "cause" shall mean a termination initiated by the Company due to the Company's reasonable dissatisfaction with Employee's performance, entertained in good faith, for such reasons as the Employee's lack of capacity or failure to perform his or her duties; the Employee's insufficient diligence; failure to conform to usual or expected (within the Company's workplace) standards of performance or other conduct; violating this Agreement or other policies of

(d) Employee shall provide the Company with thirty (30) days advance written notice of his or her voluntary termination of employment.  Such notice shall specify the name of his or her prospective new employer, his or her title and job responsibilities for such new employer, and the date on which such new employment is scheduled to begin.  If Employee has obtained other employment with a company which may be covered by Section 4(a)(i) or (ii), Employee shall provide a copy of the offer letter or other agreement with the new employer to the Company.  This notice is also required when Employee changes jobs during the Restricted Period.  The Company reserves the right to accelerate the Employee's termination date and may, at its sole discretion, cease payment of Base Salary after the termination date.  At or before the termination date, Employer shall determine whether or not it wishes to enforce or waive the non-competition provision in Section 4(a), and will so notify Employee of its determination.  If the Company elects to enforce such provision, the Employee (i) shall comply with Section 4(a), and (ii) the Company shall pay Employee, as additional consideration for his/her compliance with Section 4(a), the amount set forth as such additional consideration in the Offer Letter provided to and signed by Employee; provided, however, that if the Company determines that the Employee has violated or is violating this Section 4(a), the Company's obligation to pay additional consideration shall cease, and the Company may pursue all available remedies against Employee.

3

11. In July 2019, Mr. Brennan was promoted to "Senior Brewery Representative," which included the additional job duties and responsibilities of: additional wholesaler accounts; more direct communication with higher level managers at Boston Beer; presentations at wholesaler meetings; work with larger buying groups; work with local chains that were not covered by a Boston Beer National Account Manager or Account Specialist; and mentorship opportunities.

12. As a result of Mr. Brennan's promotion to Senior Brewery Representative, Mr. Brennan also received a pay raise; Boston Beer did not require Mr. Brennan to sign a new non-compete agreement at this time.

13. For over three and a half years, Mr. Brennan received positive performance reviews and was told by many senior level employees at Boston Beer that he had management capabilities and was on track to become a manager-level employee at the company.

14. Mr. Brennan received the highest annual review on his team in 2021 from his direct manager, Michael Rice; in January 2022, Mr. Rice promised Mr. Brennan he would receive the next promotion, once the role became available.[1]

15. Though Mr. Brennan continued to excel as a senior brewery representative, Mr. Brennan's future at Boston Beer was placed in jeopardy in April 2022 after he substantiated claims of discrimination and sexual harassment against his co-workers.[2]

16. After Mr. Brennan substantiated their allegations, he was placed on administrative leave for approximately two months.

---

[1] *See* Brennan Performance Review, Exhibit 1.

[2] *See* Brennan Affidavit, Exhibit 2.

17. In June 2022, as a direct result of voicing his support for women and seasoned employees on his team and substantiating their allegations of discrimination and sexual harassment, Mr. Brennan was retaliated against and wrongfully terminated by Boston Beer.[3]

18. Upon Mr. Brennan's termination, Boston Beer attempted to strongarm him into accepting three-thousand dollars ($3,000.00) in garden leave for the enforcement of his noncompetition agreement. When Mr. Brennan refused to accept this money, Boston Beer directly deposited it into his bank account—despite previously indicating a check would be mailed to him, should he choose to accept these terms.

19. Boston Beer's retaliatory acts against Mr. Brennan did not stop with his wrongful termination.

20. After terminating Mr. Brennan, Boston Beer made it clear to Mr. Brennan that Boston Beer intended to enforce a non-compete agreement, if he attempted to sell beer or hard cider for at least one year following his termination.

21. When Mr. Brennan was terminated by Boston Beer, his annual salary was approximately $55,000.00, and he was assigned to cover accounts in Manchester, New Hampshire and half of

---

[3] Mr. Brennan has also initiated a parallel MCAD proceeding stating claims for wrongful termination and retaliation. In its position statement, Boston Beer has conceded MCAD is not the correct forum for his non-compete claims:

> **E.   The Commission Lacks Jurisdiction over Complainants' Non-Compete Claims**
>
> The Commission lacks jurisdiction over these claims. The Commission has the power "[t]o receive, investigate and pass upon complaints of unlawful practices, as hereinafter defined, alleging discrimination because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation,… age, genetic information, ancestry, children, marital status, veteran status or membership in the armed services, the receiving of public assistance, or handicap of any person alleging to be a qualified handicapped person." The Commission has no jurisdiction over a claim of an unlawful noncompetition agreement. M.G.L. c. 151B, § 3; see also M.G.L. c. 149, § 24L ("[a]ll civil actions relating to employee noncompetition agreements subject to this section shall be brought in the county where the employee resides or, if mutually agreed upon by the employer and employee, in Suffolk county; provided that, in any such action brought in Suffolk county, the superior court or the business litigation session of the superior court shall have exclusive jurisdiction.")

Nashua, New Hampshire. Throughout his entire employment with Boston Beer, Mr. Brennan was only assigned to cover accounts in New Hampshire.

22. After Boston Beer terminated Mr. Brennan, Mr. Brennan secured a new position at Lone Pine Brewing Company ("Lone Pine"), based in Portland, Maine.

23. The Lone Pine position was a promotion for Mr. Brennan, offering a starting salary of $65,000.00—which equated to a salary increase of approximately $10,000.00.

24. The Lone Pine position also offered a more robust bonus structure; Mr. Brennan was informed by Lone Pine that if his performance was strong, he could anticipate making over $100,000.00 annually.

25. Inclusive of his annual bonus, Mr. Brennan's take home pay from Boston Beer in 2021 was only $67,000.00.

26. Bonuses at Boston Beer are calculated by what the company calls its "X Factor." Boston Beer does not disclose the criteria that factor into the "X factor," but the company's employees believe they are heavily based on the company's overall performance and each individual manager's subjective review of the employees on his/her team.

27. The Lone Pine position also offered Mr. Brennan more managerial responsibilities and the opportunity to work for a Maine-based company and cover a completely new territory—the entire state of Vermont and upstate New York—which Mr. Brennan did not cover at any time he was employed by Boston Beer.

28. As an act of further retaliation, Boston Beer called Lone Pine to investigate whether Mr. Brennan was working there.

29. Once Boston Beer had confirmed that Mr. Brennan had taken a new position, several senior executives from Boston Beer called Lone Pine, threatening to pursue litigation if Lone Pine continued to employ Mr. Brennan.

**[Remainder of this page intentionally left blank.]**

30. After several Boston Beer executives and legal representatives contacted Lone Pine threatening to enforce a non-compete agreement with Mr. Brennan, Lone Pine issued the below letter to Mr. Brennan terminating his employment as a direct result of the non-compete agreement:



John Brennan
███████████
Manchester, NH 03103

July 21, 2022

Dear John,

We are writing to follow up on our discussion of your non-competition agreement with your previous employer Boston Beer. When you first applied for a position with Lone Pine, you disclosed that you had a non-compete and stated that you were in the process of working through some issues with Boston Beer. We told you that we could not employ you until those issues were resolved. Several weeks later, you represented that the non-competition agreement was no longer an issue. Based upon that representation, we hired you on June 20, 2022.

Subsequently, on June 28, 2022, we received a phone call from someone in HR at Boston Beer who asked if we had hired you and if we were aware that you had a non-compete. Our attorney followed up and contacted your attorney, Boston Beer's in-house legal counsel, and Boston Beer's outside legal counsel. Based upon that follow up, it is our understanding that you have an enforceable non-compete agreement with Boston Beer, that your attorney has taken the position that the agreement is not enforceable, and that Boston Beer disagrees with that position and intends to enforce the agreement.

Based upon the current situation, we have decided to terminate your employment with Lone Pine effective July 21, 2022.

You will receive your final paycheck for your last week of work via direct deposit on August 5, 2022. You will also receive a COBRA Continuation Notice notifying you of your right to continue your benefits. Please return all company property to Lone Pine as soon as possible.

Sincerely,

*[signature]*

Peter Eiermann
Lone Pine Brewing Company

Lone Pine Brewing Company, LLC - 219 Anderson Street Unit #4 Portland, ME 04101

31. Under threat of litigation and a direct result of Boston Beer's enforcement of the non-compete agreement, Mr. Brennan was terminated by Lone Pine.

32. After Mr. Brennan was terminated from Lone Pine, Mr. Brennan remained unemployed for over three months and was forced to find employment in an entirely different industry thereafter.

**Boston Beer wields its non-compete agreement as a weapon against employees to prevent them from working for competitors, thereby suppressing wages throughout the industry.**

33. Previously, another former Boston Beer employee who was employed as a "Senior Brewery Representative"—the exact same position Mr. Brennan held—was hired by Lone Pine less than twelve months after he voluntarily resigned from Boston Beer.

34. Despite knowledge of this, Boston Beer did not attempt to enforce its non-compete agreement against this former employee—further evincing Boston Beer's "enforcement" of its invalid non-compete agreement against Mr. Brennan was a direct act of retaliation and a weapon the company has selectively wielded over current and former employees for years.

35. Dating back to at least 2011, Boston Beer has required its sales representatives to sign non-compete agreements as a condition of employment.[4]

36. Boston Beer has also continued to acquire "craft breweries;" as a condition of employment, Boston Beer requires all new hires to sign the same non-compete agreement—regardless of the employee's position or state of residence.

37. By way of example, when Boston Beer acquired Dogfish in 2019, the sales representatives that were onboarded from Dogfish were required to sign a noncompete agreement in order to be employed by Boston Beer.

---

[4] *See* "Hausner" Complaint, Exhibit 3.

38. Upon information and belief, approximately 30% of Dogfish's workforce refused to sign the non-compete agreement and chose to find employment elsewhere.

39. As recently as October 2023, Boston Beer filed a lawsuit against a former employee, Brian Soudant, and his new employer, Downeast Cider House, LLC.[5]

40. The Soudant complaint states the founder of Boston Beer, Jim Koch, personally and intentionally "reached out" to the owner of Downeast Cider to warn him Soudant was subject to a non-compete agreement with Boston Beer, which Boston Beer intended to enforce against Soudant and Downeast Cider.

41. Upon information and belief, Mr. Soudant was terminated from Downeast Cider thereafter.

**Boston Beer's non-compete agreements are unreasonable, unconscionable, and unenforceable under Massachusetts law.**

42. Boston Beer's non-compete agreements are substantively unconscionable and constitute an impermissible restraint on trade.

43. Massachusetts has evinced a desire to avoid onerous and excessive non-compete agreements. *See* MASS. GEN. LAWS ch. 149, § 24L ("Massachusetts Noncompetition Agreement Act").[6]

44. Pursuant to Massachusetts law, such clauses must be premised on a legitimate business interest and must be narrowly tailored in terms of time, activity, and place. *Id.*

45. Massachusetts law also recognizes that the unreasonable restraint of trade or commerce by contract is an offense against state law and public policy. *Id.*

---

[5] *See* "Soudant" Complaint, Exhibit 4.

[6] *See* MASS. GEN. LAWS ch. 149, § 24L ("Massachusetts Noncompetition Agreement Act"), Exhibit 5.

46. The Act instructs non-compete agreements "shall be supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee, provided that such consideration is specified in the noncompetition agreement." *Id.*

47. "To constitute garden leave . . . the agreement must (i) provide for the payment, consistent with the requirements for the payment of wages . . . on a pro-rata basis during the entirety of the restricted period, of at least 50 percent of the employee's highest annualized base salary paid by the employer within the 2 years preceding the employee's termination . . ." *Id.*

48. Noncompetition agreements are <u>not</u> enforceable against employees that have been terminated without cause or laid off. *Id.*

49. Boston Beer's non-compete agreements are neither supported by a legitimate business interest nor narrowly tailored. Where, as here, such agreements are unreasonable, the societal harms are magnified.

50. Boston Beer has no legitimate business interest that can justify the use of a non-compete agreement for its sales representatives.

51. Boston Beer's sales representatives do not hold or acquire trade secrets or other confidential proprietary information; and—even if, *arguendo*, they did—such information would be separately protected by the confidentiality agreement they signed.[7]

52. Mr. Brennan was not provided with adequate consideration for execution of the non-compete agreement. He was not offered sufficient monetary payment or guaranteed employment for a specified period of time in return for execution of the non-compete agreement.

---

[7] *See* responsive pleadings in opposition to Boston Beer's Motion for a Preliminary Injunction to enforce a non-compete agreement against Mr. Hausner, Exhibit 6.

53. The non-compete agreement enforced against Mr. Brennan was not narrowly tailored and contained no geographic limits; it was, therefore, unreasonable, unconscionable, and unenforceable as a matter of law.

54. Furthermore, Mr. Brennan's Employment Agreement with Boston Beer contained separate non-solicitation, confidentiality, and non-disparagement—further evincing the Agreement's restrictions were not narrowly tailored nor designed to protect a legitimate business interest.[8]

55. Non-compete agreements significantly disrupt the labor market, as they have a chilling effect on the efforts of employees to seek continued employment in a field in which they have gained familiarity. Such clauses also have a chilling effect on the ability of businesses, such as Lone Pine, to freely hire workers, by potentially subjecting these businesses to litigation, and by limiting the pool of available workers.

56. The use of non-compete agreements for at-will sales representatives, like Mr. Brennan, limits the ability of employees to find new employment; limits the ability of employees to move to a new state and find employment where Boston Beer sells its products; hinders the upward mobility of workers looking for higher wages or advancement with new employment using skills obtained in their current employment; and suppresses wages for employees who have limited negotiating power with both current and potential new employers when they are limited by a non-compete agreement.

---

[8] *See* M.G.L. c. 149, § 24L (b) (iii): "The agreement must be no broader than necessary to protect one or more of the following legitimate business interests of the employer: (A) the employer's trade secrets; (B) the employer's confidential information that otherwise would not qualify as a trade secret; or (C) the employer's goodwill. A noncompetition agreement may be presumed necessary where the legitimate business interest cannot be adequately protected through an alternative restrictive covenant, including but not limited to a non-solicitation agreement or a non-disclosure or confidentiality agreement."

57. This suppression of wages and hindrance on mobility impacts trade and commerce throughout Massachusetts, and beyond.

58. Accordingly, Boston Beer has engaged in unfair conduct in violation of the Massachusetts Noncompetition Agreement Act by requiring its current and former employees to sign unenforceable non-compete agreements without consideration, without a legitimate business reason, and without narrowly tailoring the agreements to protect any purported confidential or trade secret information.

59. To the extent that Boston Beer knows it will not—and *cannot*—enforce the terms of its non-compete agreement but has failed to inform Mr. Brennan and the company's other current and former employees of such information, Boston Beer has omitted material information.

60. Information that their executed non-compete agreements would not be enforced by Boston Beer would be material to its current and former employees, who Boston Beer has made to believe are bound by them.

61. By failing to inform current and former employees of this material fact, Boston Beer has also engaged in deceptive conduct in violation of Massachusetts' Consumer Protection Act (M.G.L. c. 93A § 11).

62. Consumers benefit from competition among employers because a more competitive workforce will create more and higher quality goods and services.

63. In recognition of this, in January 2023, the Federal Trade Commission (FTC) "proposed a new rule that would ban employers from imposing noncompetes on their workers, a widespread

and often exploitative practice that suppresses wages, hampers innovation, and blocks entrepreneurs from starting new businesses."[9]

64. The FTC estimates outlawing non-compete agreements "could increase wages by nearly $300 billion per year and expand career opportunities for about 30 million Americans." *Id.*

65. In September 2023, the Department of Labor (DOL) joined the FTC in its efforts to ban non-compete agreements, signing an agreement intended to "bolster the FTC's efforts to protect workers by promoting competitive U.S. labor markets and putting an end to unfair, deceptive, and other unlawful acts and practices, as well as unfair methods of competition, that harm workers."[10]

## CAUSES OF ACTION
## Tortious Interference with Contract & Business Relations

66. Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if stated fully herein.

67. A plaintiff bringing a claim of tortious interference with contract and business relations relationship must prove that: (1) he had a contract/business relations with a third party; (2) the defendant knowingly interfered with that contract/business relationship; (3) the defendant's

---

[9] "FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition" (last accessed January 3, 2024) available at: https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition.

[10] "FTC, Department of Labor Partner to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices" (last accessed January 3, 2024) available at: https://www.ftc.gov/news-events/news/press-releases/2023/09/ftc-department-labor-partner-protect-workers-anticompetitive-unfair-deceptive-practices ("The agreement signed by the FTC and DOL "identifies areas of mutual interest for the two agencies: collusive behavior; the use of business models designed to evade legal accountability, such as the misclassification of employees; illegal claims and disclosures about earnings and costs associated with work; the imposition of one-sided and restrictive contract provisions, such as non-compete and training repayment agreement provisions; the extent and impact of labor market concentration; and the impact of algorithmic decision-making on workers").

interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

68. Here, Mr. Brennan has stated:

(1) Boston Beer knew Mr. Brennan had entered into a new employment contract and business relations with Lone Pine;

(2) Boston Beer interfered with Mr. Brennan's employment contract and business relations with Lone Pine by contacting Lone Pine's owner and legal counsel, threatening to enforce a non-compete agreement against Mr. Brennan and Lone Pine;

(3) Boston Beer's interference was intentional and improper, as it was an act of further retaliation against Mr. Brennan—evidenced by Boston Beer's previous decision to refrain from enforcing the non-compete clause against another former employee hired by Lone Pine less than one year after he left Boston Beer; and

(4) Mr. Brennan was harmed by Boston Beer's retaliatory acts because Lone Pine terminated him, causing Mr. Brennan to lose his employment for over three months and requiring him to seek employment in an entirely different industry, thereby sacrificing career prospects in the brewery industry.

69. The non-compete clause of the Employment Agreement Boston Beer sought to enforce against Mr. Brennan and Lone Pine was unlawful and unenforceable under M.G.L. c. 149, § 24L for at least the following reasons:

- The non-compete clause was not narrowly tailored by scope or geography—Mr. Brennan was hired by Lone Pine to work in a different geographic territory (Vermont and upstate New York) than he was assigned while working for Boston Beer (Manchester. New Hampshire and half of Nashua, New Hampshire);

- Mr. Brennan was assigned different job functions and managerial tasks by Lone Pine that he was never assigned by Boston Beer;

- Mr. Brennan was wrongfully terminated by Boston Beer;

- Mr. Brennan did not sign a new non-compete agreement with Boston Beer after he was promoted to "Senior Brewery Representative" and his role within the company materially changed, as required by law per the "material change doctrine;"

- Mr. Brennan was not provided garden variety leave, or adequate consideration by Boston Beer; and

- Boston Beer's non-compete agreement was not consonant with public policy.

70. Boston Beer knew of the existence of a contract and business relationship between Mr. Brennan and Lone Pine—evidenced by the fact Boston Beer's executive-level employees and legal counsel corresponded with Lone Pine on numerous occasions.

71. These correspondences were intentionally sent by Boston Beer with the improper motive of inducing Lone Pine, a Maine corporation, to terminate its contract and business relations with Mr. Brennan.

72. As a direct consequence of Boston Beer's actions, Mr. Brennan was terminated by Lone Pine, thereby depriving him of his employment and other tangible and intangible rights.

73. WHEREFORE, Plaintiff demands a trial by jury and judgment against Boston Beer and its agents and employees, in an amount to be determined at trial, plus interest, cost, punitive damages, and attorneys' fees where applicable.

**Breach of Contract**

74. Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if stated fully herein.

75. Boston Beer entered into written contracts with Mr. Brennan.[11]

76. Boston Beer knowingly enforced an invalid non-compete agreement upon Mr. Brennan in bad faith with the expectation that he would simply comply and not argue the legal validity of his Employment Agreement.

77. Boston Beer in bad faith drafted its non-compete agreement, contained within Mr. Brennan's Employment Agreement, to be overly broad as to the scope, geography, and time period in which it restricted its employees, including Mr. Brennan, in hopes they could stifle competition in the brewery industry.

78. Furthermore, Boston Beer breached its Employment Agreement with Mr. Brennan by electronically transferring three thousand dollars ($3,000.00) against his stated permission vis-à-vis his checking account after Mr. Brennan was wrongfully terminated by the company.

79. WHEREFORE, Plaintiff demands a trial by jury and judgment against Boston Beer and its agents and employees, in an amount to be determined at trial, plus interest, cost, punitive damages, and attorneys' fees where applicable.

## Breach of Implied Covenant of Good Faith and Fair Dealing

80. Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if stated fully herein.

81. Boston Beer entered into written contracts with Mr. Brennan.[12]

82. Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.

---

[11] *See* Employment Agreement, Exhibit 7.

[12] *See Id.*

83. The covenant provides that neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract.

84. Through its actions as stated herein, Boston Beer acted in bad faith and breached the implied covenant of good faith and fair dealing through its wrongful conduct to Mr. Brennan, as stated herein.

85. WHEREFORE, Plaintiff demands a trial by jury and judgment against Boston Beer and its agents and employees, in an amount to be determined at trial, plus interest, cost, punitive damages, and attorneys' fees where applicable.

## Unjust Enrichment

86. Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if stated fully herein.

87. Boston Beer has been unjustly enriched at Mr. Brennan's expense.

88. Boston Beer has received significant financial benefits through its wrongful acts stated herein, and Mr. Brennan has lost financial expectations.

89. Boston Beer has no valid legal or equitable claim to the financial benefits it has derived from its wrongful acts. It would be inequitable for Boston Beer to retain such benefits.

90. Accordingly, Boston Beer is entitled to an award equal to the amount of Boston Beer's unjust enrichment so as to divest the inequitable benefits from Boston Beer and return them to Mr. Brennan.

91. WHEREFORE, Plaintiff demands a trial by jury and judgment against Boston Beer and its agents and employees, in an amount to be determined at trial, plus interest, cost, punitive damages, and attorneys' fees where applicable.

**Violations of the Massachusetts Consumer Protection Act (M.G.L. c. 93A § 11)**

92. Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if stated fully herein.

93. Boston Beer engaged in unfair and deceptive acts and practices in violation of M.G.L. c. 93A § 11, Massachusetts' Consumer Protection Act.

94. At all times relevant hereto, Boston Beer was engaged in trade and commerce in the Commonwealth of Massachusetts including in and through its relationship with Mr. Brennan.

95. Boston Beer engaged in unfair and deceptive conduct in the course of its dealings with Mr. Brennan, including but not limited to breaching its contract with Mr. Brennan and the covenant of good faith and fair dealing to obtain a pecuniary benefit at Mr. Brennan's expense.

96. Boston Beer's unfair and deceptive conduct was knowing and willful.

97. Mr. Brennan suffered damages and lost money as a result of Boston Beer's unfair and deceptive conduct.

98. Pursuant to Massachusetts law, a contract terminated in bad faith may provide the basis for a valid claim under c. 93A.

99. WHEREFORE, Defendant is liable for the damages Plaintiff suffered as a result of Defendant's unfair and deceptive acts, and Plaintiff is entitled to treble damages, attorneys fees, and costs, for Defendant's willful violation of M.G.L. c. 93A § 11.

**PRAYER FOR RELIEF AND JURY DEMAND**

100. Based on the foregoing causes of action, Plaintiff demands judgment against Defendant in an amount to be determined in a trial by jury; for a sum that will fully and fairly compensate Plaintiff for his injuries and conscious pain and suffering, that Plaintiff recovers actual damages; that Plaintiff is entitled to recover compensatory damages; that Plaintiff recovers

punitive damages; that Plaintiff recover treble damages pursuant to Defendant's willful violation of M.G.L. c. 93A § 11, together with litigation costs, expenses and reasonable and necessary attorneys' fees; that Plaintiff recover pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and any and all other relief to which Plaintiff may be justly entitled.

101.    Plaintiff demands a trial by jury on all issues so triable.

DATED: January 3, 2024

Respectfully Submitted,

_____
Ashley M. Pileika
Massachusetts State Bar No. 709954
Darren R. Wolf*
Texas State Bar No. 24072430
**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
P:  214-346-5355 | F: 214-346-5909
ashley@darrenwolf.com
darren@darrenwolf.com
*Pro hac vice application forthcoming*