## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JOHN BRENNAN, and KATHERINE FRITTS,** | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| **Plaintiffs,** | |
| **v.** | **Hon. George A. O' Toole, Jr.** |
| **THE BOSTON BEER COMPANY, INC.** | **Case No. 1:24-cv-10029** |
| **Defendant.** | |

## <u>INTRODUCTION</u>

1.  Plaintiffs John Brennan (hereinafter "Mr. Brennan") and Katherine Fritts (hereinafter "Ms. Fritts") (together "Plaintiffs") bring this First Amended Complaint against Defendant, The Boston Beer Company, Inc. (hereinafter "Boston Beer" or "Defendant").

2.  Boston Beer has refused to address employees' complaints of the company's discriminatory work environment; instead, it has required and continues to require that its employees sign an unreasonable and overly broad non-compete agreements which operates, among other onerous and burdensome ways, to restrict them from continuing to work in the beer industry in any capacity.

3.  Effectively, this agreement requires employees accept unfair wages in addition to acts of discrimination, harassment, and retaliation, because if they stop working for Boston Beer, their options for new employment are subject to outrageously broad restrictions and additional acts of post-employment retaliation.

**PARTIES**

4.   Plaintiff Katie Fritts is a resident of Windsor County, Vermont, where she is domiciled and maintains her citizenship.

5.   Plaintiff John Brennan is a resident of Hillsborough County, New Hampshire, where he is domiciled and maintains his citizenship.

6.   Defendant, The Boston Beer Company, is an incorporated entity under the laws of Massachusetts, maintaining its citizenship therein, and operates its principal office at One Design Center Place, Suite 850 Boston, Massachusetts, 02210.

7.   Upon information and belief, Boston Beer employs sales representatives in Massachusetts, New York, California, Vermont, New Hampshire, Pennsylvania, Delaware, Washington, Oregon, and Ohio, among other places.

**JURISDICTION AND VENUE**

8.   This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. 1332(a)(1), as Plaintiffs and Defendant are diverse from one another, as citizens of different states, and the matter in controversy exceeds the value of $75,000.

9.   Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. 1391(b)(1), as this Complaint is brought in the same judicial district in which the Defendant resides and pursuant to 28 U.S.C. 1391(b)(2), as a substantial part of the events or omissions giving rise to this claim arose in this judicial district.

10. Title 28 U.S.C. §1331 provides federal question jurisdiction over federal claims. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Massachusetts.

11. Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims. Plaintiffs filed a charge of discrimination and retaliation,

individually and on behalf of all similarly situated current and former Boston Beer employees, with the Equal Employment Opportunity Commission ("EEOC") on or about March 1, 2023. Pursuant to the EEOC's worksharing agreement with the Massachusetts Commission Against Discrimination ("MCAD"), their charge is considered dually filed with MCAD. By notice dated February 2, 2024, the EEOC dismissed Plaintiffs' case and issued a Notice of Right to Sue.

## **FACTUAL ALLEGATIONS**

### *Katie Fritts*

12. Ms. Fritts began her career at Boston Beer in February 2016 in Portland, Oregon where she was hired for an entry level sales position, as a "Brewery Representative." As a condition of employment, Ms. Fritts signed an Employment Agreement with Boston Beer, which included the following noncompete provision:

> 4. **Covenant Not-to-Compete.**
>
> (a) During the period commencing on the date hereof and continuing until the expiration of one (1) year from the date on which the Employee's employment with the Company terminates (the "Restricted Period"), the Employee shall not, without the prior written consent of the Company, which consent the Company may grant or withhold in its sole discretion, directly or indirectly, for his or her own account or the account of others, in any geographic areas in which Employee provided services to the Company, or about which Employee obtained Proprietary Information, during the last two years of his/her employment by the Company, as an employee, consultant, partner, officer, director or stockholder (other than a holder of less than five percent (5%) of the issued and outstanding stock or other equity securities of an issuer whose securities are publicly traded), or otherwise, engage in the importing, production, marketing, sale or distribution to distributors of any beer, malt beverage, hard cider or product produced by the Company at any time during the Employee's tenure with the Company (i) which is either produced outside of the United States and imported into the United States or produced within the United States and ii) which has a wholesale price within twenty-five (25%) of the wholesale price of any of the Company's products, including but not limited to products marketed under the trade names SAMUEL ADAMS, TWISTED TEA, ANGRY ORCHARD, TRULY and such other trade names as the Company may use to market its products during the Employee's employment with the Company. The Employee acknowledges that he or she has read and understands this provision, and that he or she has agreed to it knowingly and voluntarily, in order to obtain the benefits provided to Employee by the Company. Notwithstanding the foregoing, in the event that you breach your fiduciary duty to the Company, and/or you have unlawfully taken, physically or electronically, property belonging to the Company, the Restricted Period shall be twenty four (24) months from the date of your employment termination; provided, however, that the additional consideration provided for in paragraph 4(d) hereof shall not exceed the additional consideration set forth in paragraph 4(d) in any event.
>
> (b) The parties agree that Paragraph 4(a) hereof shall not apply to Employee (i) if Employee is a non-exempt employee of the Company on the date of termination, and/or (ii) if his or her employment by the Company is terminated by the Company without cause, or pursuant to a reduction in force.

(c)     As used herein, the term "cause" shall mean a termination initiated by the Company due  to the Company's reasonable dissatisfaction with Employee's performance, entertained in good faith, for such reasons as the Employee's lack of capacity or failure to perform his or her duties; the Employee's insufficient diligence; failure to conform to usual or expected (within the Company's workplace) standards of performance or other conduct; violating this Agreement or other policies of

(d)     Employee shall provide the Company with thirty (30) days advance written notice of his or her voluntary termination of employment.  Such notice shall specify the name of his or her prospective new employer, his or her title and job responsibilities for such new employer, and the date on which such new employment is scheduled to begin.  If Employee has obtained other employment with a company which may be covered by Section 4(a)(i) or (ii), Employee shall provide a copy of the offer letter or other agreement with the new employer to the Company.  This notice is also required when Employee changes jobs during the Restricted Period.  The Company reserves the right to accelerate the Employee's termination date and may, at its sole discretion, cease payment of Base Salary after the termination date.  At or before the termination date, Employer shall determine whether or not it wishes to enforce or waive the non-competition provision in Section 4(a), and will so notify Employee of its determination.  If the Company elects to enforce such provision, the Employee (i) shall comply with Section 4(a), and (ii) the Company shall pay Employee, as additional consideration for his/her compliance with Section 4(a), the amount set forth as such additional consideration in the Offer Letter provided to and signed by Employee; provided, however, that if the Company determines that the Employee has violated or is violating this Section 4(a), the Company's obligation to pay additional consideration shall cease, and the Company may pursue all available remedies against Employee.

13. Later in 2016, Ms. Fritts was promoted to "Senior Brewery Representative," which included the additional job duties and responsibilities of: additional wholesaler accounts; more direct communication with higher level managers at Boston Beer; presentations at wholesaler meetings; work with larger buying groups; work with local chains that were not covered by a Boston Beer National Account Manager or Account Specialist; and mentorship opportunities.

14. As a result of Ms. Fritts' promotion to Senior Brewery Representative, Ms. Fritts also received a pay raise; Boston Beer did not require Ms. Fritts to sign a new non-compete agreement at this time.

15. Throughout Ms. Fritts' first three years at Boston Beer on the Pacific Northwest Team, she consistently received positive performance reviews from her direct managers.

16. In July 2018, Ms. Fritts' direct manager informed Ms. Fritts that he believed Ms. Fritts was ready to successfully take on a managerial position within the coming year.

17. In June 2019, Ms. Fritts and her family planned to relocate back to the East Coast after her husband accepted an anesthesiology residency at Dartmouth Hitchcock Medical Center; as such, Ms. Fritts resigned from her position on the Pacific Northwest Team.

18. During Ms. Fritts' 2019 exit interview with head of Human Resources, Lauren Manchester. Ms. Manchester mentioned a potential opening on the Northern New England Team based.

19. Boston Beer had a policy against rehiring employees who have resigned, but Ms. Manchester stated Ms. Fritts was a promising candidate for the Northern New England opening and that Boston Beer was willing to make an exception to rehire Ms. Fritts.

20. With the special approval of Boston Beer's founder, Jim Koch, and Chief Executive Officer, Dave Burwick, Boston Beer made an exception to its hiring policy for Ms. Fritts to join the Northern New England Team based on her strong performance, growth trajectory, and positive feedback received from her previous direct managers, wholesalers, and co-workers.

21. In July 2019, Ms. Fritts was rehired by Boston Beer in New Hampshire under the direct management of Michael Rice; when Ms. Fritts was rehired by Boston Beer in 2019 and moved to a role in New Hampshire, she was not required to sign a new non-compete agreement.

22. Soon after joining the Northern New England Team, Ms. Fritts was quickly cautioned by her co-workers to tread cautiously around Mr. Rice. In acts to caution Ms. Fritts, several other female co-workers confided in her that they "tip-toed" around Mr. Rice to avoid negative feedback, discrimination, and retaliation.

23. Ms. Fritts was required to attend "work with" days with Mr. Rice, which consisted of dirivng alone in a vehicle with Mr. Rice to visit customer accounts. As a direct manager, Mr. Rice was tasked with coaching his subordinates, including Ms. Fritts and Mr. Brennan, to become stronger sales representatives.

24. During one of Ms. Fritts' early "work with" days with Mr. Rice in 2019, Ms. Fritts was stunned by Mr. Rice's use of derogatory comments directed towards women in the workplace.

25. Throughout the "work with" day, Mr. Rice referred to a female wholesaler, Kendall MacNamara, as "Ken-Doll" (referring to Mattel's male counterpart to the famous "Barbie" doll-Ken) due to his perception of Ms. MacNamara's "masculine" appearance and sexual orientation. Mr. Rice's derogatory comments continued throughout this meeting.

26. Another male employee, Maxx Hockenberry, who was supervised by Mr. Rice reported during one "work with," Mr. Rice forced Mr. Hockenberry to view a naked photograph of a woman Mr. Rice was dating and repeatedly insulted the intelligence of female employees, customers, and women generally throughout Mr. Hockenberry's employment at Boston Beer.

27. Despite corporate knowledge of Mr. Rice's discriminatory behavior, Boston Beer ratified Mr. Rice's acts of discrimination and retaliation by continuing to promote Mr. Rice.

28. At one point during a February 2020 work with, Ms. Fritts asked Mr. Rice for specific feedback as to what she could improve on, Mr. Rice responded with profanity shouting, "Next time you don't do something correctly, I'll just say, 'what the f***, Katie?'"

29. Ms. Fritts was taken aback and distressed by Mr. Rice's response to her request for genuine feedback.

30. In a subsequent meeting, where Mr. Rice, Ms. Fritts, and Mr. Kelly were present, Ms. Fritts brought attention to Mr. Rice's attempt to degrade and humiliate her and expected Mr. Kelly to address the situation. Ms. Fritts asked if Mr. Rice remembered what he said to her. Mr. Rice responded with, "Yeah, I said 'What the f***!'"

31. In response, Ms. Fritts' upper management, Mr. Kelly, Northern New England's Regional Manager, remained silent. In doing so, Ryan Kelly ratified and condoned the actions of Mr. Rice and gave Ms. Fritts the impression that similar behavior was to be tolerated going forward.

32. Mr. Rice intentionally excluded Ms. Fritts and other female employees from golf outings with important outside vendors—instead including only male employees.

33. Building relationships with outside vendors was a critical component of Ms. Fritts' job. As a result of Mr. Rice's intentional exclusion of Ms. Fritts and other female employees, Mr. Rice prevented hampered their ability to perform critical functions of their job, at no fault of their own.

34. In May of 2021, Ms. Fritts brought Mr. Rice's actions to the attention of Mr. Kelly via an email and subsequent phone call. During this call, Mr. Kelly made excuses for Mr. Rice's behavior and took no corrective action to ensure that Ms. Fritts, or her other female co-workers, would be included moving forward.

35. As a result of Mr. Kelly's silence, Ms. Fritts and other female employees at Boston Beer were continually excluded from golf tournaments and other important client events.

36. Despite the hostile work environment and frequent occurrences of discrimination, Ms. Fritts continued working diligently and strived to advance her career at Boston Beer. The lack of support and guidance from Mr. Rice and Mr. Kelly prompted Ms. Fritts to seek the mentorship and insight of other female leaders within Boston Beer's network.

37. On June 7, 2021, Ms. Fritts emailed the regional manager, Katie Healy, inquiring about a managerial bridge experience and expressed her desire to learn more about Ms. Healy's "path at Boston Beer." Ms. Healy responded positively but included Mr. Kelly and Mr. Rice in the carbon copy line of her return email.

38. Upon Mr. Rice's receipt of Ms. Healy's June 7, 2021 email, Mr. Rice admonished Ms. Fritts for reaching out to someone outside of their team without his direct approval and prior knowledge and warned her not to do so again.

39. Mr. Rice angrily told Ms. Fritts she was "not ready" to be promoted to a managerial position without providing any reason(s) as to why he believed this to be true.

40. In response, Ms. Fritts referenced over five years of positive performance reviews from managers and favorable feedback received from Boston Beer wholesalers. She further noted she had seven years in the sales industry due to her previous employment at Miller Coors.

41. Mr. Rice did not argue that Ms. Fritts was a successful employee. Instead, he angrily restated he was upset Ms. Fritts had approached Ms. Healy without his permission and stated Ms. Fritts needed to accept more "coaching" from him. Though Ms. Fritts was receptive of Mr. Rice's critiques, he could not provide any specific examples or performance metrics she could improve.

42. The exchange between Ms. Fritts, Mr. Rice, and Ms. Healy left Ms. Fritts fearful that Mr. Rice would lash out or retaliate against her in the future if she continued to pursue a bridge experience with Ms. Healy.

43. Ms. Fritts began reaching out to other powerful female executives at Boston Beer inquiring about steps she could take to advance her career at Boston Beer.

44. On October 5, 2021, Ms. Fritts got coffee with Gina Des Cognets, Boston Beer's Director of Leadership and Development.

45. Ms. Des Gognets received Ms. Fritts warmly and offered heartfelt advice about how Ms. Fritts might further develop and succeed at Boston Beer.

46. Ms. Des Cognets stated she was thoroughly impressed by Ms. Fritts but perceived Ms. Fritts was struggling under the management practices of Mr. Rice. Ms. Des Cognets indicated Mr.

Rice felt undermined by female employees who challenged the "boys club" mentality shared by Boston Beer's upper management. Ms. Des Cognets explained to Ms. Fritts that challenging that status quo would not be easy, as it was ingrained in Boston Beer's policies and practices and informed the decision-making of many senior leaders at the company.

47. Ms. Des Cognets advised Ms. Fritts she should try to talk to Kate Rogers, the Division Director of the New England Team, but Ms. Fritts stated she did not feel comfortable doing so, as she feared Mr. Rice would learn about it and admonish Ms. Fritts once again.

48. Ms. Fritts did agree, however, to Ms. Des Cognets' offer to connect Ms. Fritts with the Diversity and Inclusion team. On October 6, 2021, Ms. Fritts received a friendly email from Carissa Sweigart offering Ms. Fritts insight into what it meant to be a female leader.

49. Ms. Fritts met with Ms. Sweigart on three occasions. During their first meeting on October 13, 2021, the two discussed advancement opportunities at Boston Beer, which Ms. Sweigart encouraged Ms. Fritts to pursue.

50. On October 14, 2021, Ms. Sweigart provided Ms. Fritts with a follow-up email in which she continued to share her own development at Boston Beer, in hopes that it would help guide Ms. Fritts in her own experience.

51. As a courtesy during January 2022, Ms. Fritts expressed to Mr. Rice on several occasions that she was applying for managerial roles outside of their Northern New England Team.

52. On January 19, 2022, during Ms. Fritts' weekly call with Mr. Rice, Ms. Fritts discussed her interest in applying for the newly listed Northern New England Marketing Manager role and disclosed she had a call with Fawn Segaloff, who had recently transferred out of the position.

53. After Ms. Fritts' discussion with Ms. Segaloff, she was also encouraged to reach out to Andrea Desaulniers to inquire about moving into a Bevy Brand Manager position.

54. Again, in the interest of transparency, on January 24, 2022, Ms. Fritts sent an email to Mr. Rice explaining that she was planning to apply for the Bevy Brand Manager position. Mr. Rice never replied to this email.

55. On January 27, 2022, Ms. Fritts learned Mr. Rice had given Ms. Fritts a poor performance review for 2021.

56. Ms. Fritts was shocked to learn she had received a poor review, especially since Ms. Fritts' received a very positive 2021 mid-year review. At no time in 2021 did Mr. Rice indicate Ms. Fritts she was at risk of receiving a poor annual performance review.

57. Boston Beer has an internal policy preventing employees that receive a poor annual performance review from promoting or assuming new managerial positions for an entire calendar year—meaning Ms. Fritts could not apply for a promotion or a managerial position until 2023.

58. When Ms. Fritts reviewed her poor 2021 performance review, she noticed that many of the complaints that Mr. Rice had with her performance were from much earlier in the year. These statements ran directly contrary to the previous mid-year performance review Ms. Fritts had received from Mr. Rice. In Ms. Fritts' mid-year performance review, her work ethic and accomplishments were consistently met with positivity.

59. Comparing Ms. Fritts' 2021 annual review with Mr. Brennan's annual review shows Mr. Rice failed to exhibit any demonstrable amount of equality between his female and male subordinates. Mr. Rice used anecdotal evidence to demonstrate that Mr. Brennan was a "DOMINATE" employee.[1]

---

[1] *See* Comparison of Fritts and Brennan 2021 Performance Reviews, Exhibit 1.

60. Further, Mr. Rice did not even use the same sub-headings to rate Ms. Fritts. Mr. Rice completely left out the "Capabilities you use to achieve results" section for Ms. Fritts' review—a category that Mr. Rice had plenty to say for Mr. Brennan.

61. As a result of Mr. Rice's discriminatory acts against Ms. Fritts, in combination with Boston Beer's internal Boston Beer policy preventing promotion, he was able to swiftly shut down any opportunity that Ms. Fritts had previously opened through her networking, leadership, and genuine desire to be eligible for a higher salaried managerial role within Boston Beer.

62. And as a direct result of her poor 2021 performance review, the positions Ms. Fritts had previously applied for were no longer available. Instead, she remained under the management of Mr. Rice.

63. In a February 4, 2022 email, Ms. Fritts regretfully informed Ms. Desaulniers she could no longer pursue the Bevy Brand Manager position because she had received a poor 2021 performance review. In response, Ms. Desaulniers was disappointed to hear of Ms. Fritts' "roadblocks" and expressed that she would have been a "great match" for the role.

64. Ms. Fritts is one of many female employees that suffered from Boston Beer's policies and practices resulting in acts of discrimination, retaliation, and unequal pay.

65. In the several months leading up to Ms. Fritts' wrongful termination from Boston Beer, other female employees lamented similar accounts of male managers retaliating against them by giving them poor performance reviews after they too had exposed their managers' discriminatory actions and/or expressed their desire to promote to a managerial role.

66. Ms. Fritts and Mr. Brennan are aware of at least ten (10) other former female employees that received poor performance reviews based on unfair, subjective criteria that prevented them from advancing their careers at Boston Beer, similar to Ms. Fritts, effectively forcing them out of

the company and the beer industry due to Boston Beer's enforcement of the non-compete provision of its Employment Agreement.

67. This pattern of discrimination has directly translated to lesser base pay, bonuses, and stock option for female employees, including Ms. Fritts, at Boston Beer.

68. Boston Beer's upper management knew their rating system was flawed and arbitrary when Ms. Fritts received her poor 2021 annual review.

69. After Ms. Fritts received her poor 2021 annual performance review from Mr. Rice, Ms. Fritts met with Ms. Sweigart on two more occasions. In each of these meetings, Ms. Fritts noticed a recognizable shift in Ms. Sweigart's tone and demeanor towards her, as compared to her behavior during their first meeting.

70. During Ms. Fritts and Ms. Sweigart's second meeting, Ms. Fritts was directly asked about her relationship with Mr. Rice. When Ms. Fritts referenced derogatory statements made by Mr. Rice to her, Ms. Sweigart acknowledged his behavior was unacceptable but stated too much time had passed to report the matter to Human Resources.

71. Further into Ms. Sweigart and Ms. Fritts' second meeting, the two discussed the poor performance review and its impact on Ms. Fritts' career at Boston Beer. During this conversation, Ms. Sweigart encouraged Ms. Fritts "not to get too hung up on the rating."

72. Ms. Sweigart also disclosed to Ms. Fritts that upper-level management was cognizant that Boston Beer's performance rating system was flawed and overly subjective. She further stated that Boston Beer had been "discussing improving the system for some time."

73. On April 11, 2022, Ms. Fritts met with Ms. Sweigart for her third and final time. Prior to Ms. Fritts' third meeting with Ms. Sweigart, Boston Beer took part in an ambiguous corporate

restructuring earlier in April of 2022. As a result of the restructuring, a "team lead role" was added to the Northern New England Team—a role Ms. Fritts was effectively already fulfilling.

74. Ms. Fritts expressed her discontent to Ms. Sweigart about her current situation and that her poor performance review was preventing her from advancing her career—including base pay, bonus pay, and stock options—at Boston Beer.

75. In response to Ms. Fritts' frustration, Ms. Sweigart stated, often when roles at Boston Beer were created, typically management already had an employee in mind for the position. In return, Ms. Sweigart encouraged Ms. Fritts to continue her "development" under the management of Mr. Rice and revisit opportunities to promote in 2023.

76. In April 2022, Ms. Fritts shared her grievances with Mr. Rice's discriminatory treatment towards her and other female employees with Ms. Manchester. Ms. Fritts also asked Ms. Manchester if it was possible for a higher-level manager to review the basis Mr. Rice gave Ms. Fritts a poor performance review, as his criteria was completely subjective.

77. After speaking with Ms. Manchester, Ms. Fritts was placed on administrative leave and told the company would investigate her allegations of discrimination and retaliation.

78. Thereafter, Boston Beer conducted a sham investigation into Ms. Fritts' grievances, which resulted in further retaliatory action taken against Ms. Fritts and Mr. Brennan.

79. As soon as Boston Beer's internal investigation commenced, it was evident Boston Beer had no intention of conducting an unbiased, lawful investigation into Ms. Fritts' grievances.

80. On May 12, 2022, Ms. Fritts was informed Boston Beer's internal investigation was complete, and the "results" showed no signs of discrimination or retaliation. Contrarily, Mr. Brennan was informed by Ms. Manchester thereafter that the investigation was ongoing on two separate occasions thereafter.

81. The conduct surrounding Boston Beer's internal investigation demonstrates the company's lack of a stated and consistent policy for assessing employee performance and responding to employee grievances, resulting in further acts of discrimination and retaliation.

82. On May 9, 2022, Boston Beer informed Ms. Fritts the company had data that justified Ms. Fritts' poor performance review. Boston Beer then sent Ms. Fritts one ambiguous chart of sales call data—which Boston Beer's general counsel later conceded had been manipulated and the incorrect "filter" had been applied to the data. No further data was proffered by Boston Beer to justify Ms. Fritts' poor performance review.

83. At no point during Boston Beer's internal investigation were employees provided with any guidance for how the investigation would be conducted and remain impartial.

84. At no point were Ms. Fritts or Mr. Brennan provided a written outcome of the investigation and any of its findings.

85. After Boston Beer's investigation concluded, Ms. Fritts was further devalued by Boston Beer's external counsel who expressed he was "disappointed" Ms. Fritts did not accept Mr. Rice's poor performance review.

86. Boston Beer never provided Ms. Fritts with any objective analysis as to why she received a poor performance review, besides the incorrectly filtered sales calls data referenced above, resulting in lesser pay and the inability to apply to a managerial role for the entire year of 2022.

87. In an act of further retaliation, Ms. Fritts was informed by Boston Beer in May 2022 she could resume her role as a sales representative under Mr. Rice's direct supervision, but she would be put on a corrective action plan due to her 2021 poor performance review.

88. In June 2022, as a direct result of voicing acts of discrimination and sexual harassment, Ms. Fritts was further retaliated against and wrongfully terminated by Boston Beer.

89. Upon Ms. Fritt's termination, Boston Beer attempted to strongarm her into accepting three-thousand dollars ($3,000.00) in garden leave for the enforcement of its one-year noncompetition agreement.

90. Even after Ms. Fritts did not accept this payment, Boston Beer informed Ms. Fritts the company was enforcing the noncompetition agreement against her for a one-year period.

91. As a result, Ms. Fritts was unemployed for several month until she finally secured a position in sales in a completely new industry for a tech company.

92. Unfortunately, in November 2022, due to no fault of Ms. Fritts' own, Ms. Fritts' entire division was laid off.

93. Thereafter, Ms. Fritts remained unemployed for a number of months and worked several odd jobs, resulting in a significant loss of earnings for Ms. Fritts after she was wrongfully terminated by Boston Beer in June 2022.

### *John Brennan*

94. In January 2019, Mr. Brennan was hired as a "Brewery Representative," an entry-level sales position at Boston Beer; Mr. Brennan's job was to sell beer in a territory that encompassed Manchester, New Hampshire and Northern New Hampshire.

95. As a condition of employment, Mr. Brennan signed an Employment Agreement with Boston Beer, which included the same noncompetition agreement Ms. Fritts was required to sign.

96. In July 2019, Mr. Brennan was promoted to "Senior Brewery Representative," which included the additional job duties and responsibilities of: additional wholesaler accounts; more direct communication with higher level managers at Boston Beer; presentations at wholesaler meetings; work with larger buying groups; work with local chains that were not covered by a Boston Beer National Account Manager or Account Specialist; and mentorship opportunities.

97. As a result of Mr. Brennan's promotion to Senior Brewery Representative, Mr. Brennan also received a pay raise; Boston Beer did not require Mr. Brennan to sign a new non-compete agreement at this time.

98. For over three and a half years, Mr. Brennan received positive performance reviews and was told by many senior level employees at Boston Beer that he had management capabilities and was on track to become a manager-level employee at the company.

99. Mr. Brennan received the highest annual review on his team in 2021 from his direct manager, Michael Rice; in January 2022, Mr. Rice promised Mr. Brennan he would receive the next promotion, once the role became available.[2]

100. Though Mr. Brennan continued to excel as a senior brewery representative, Mr. Brennan's future at Boston Beer was placed in jeopardy in April 2022 after he substantiated claims of discrimination and sexual harassment against Ms. Fritts and his other co-workers.

101. After Mr. Brennan substantiated their allegations, he was placed on administrative leave for approximately two months.

102. In June 2022, as a direct result of voicing his support for Ms. Fritts and other female and seasoned employees on his team and substantiating their allegations of discrimination, Mr. Brennan was retaliated against and wrongfully terminated by Boston Beer.

103. Upon Mr. Brennan's termination, Boston Beer attempted to strongarm him into accepting three-thousand dollars ($3,000.00) in garden leave for the enforcement of his noncompetition agreement. When Mr. Brennan refused to accept this money, Boston Beer directly

---

[2] *See* Comparison of Fritts and Brennan 2021 Performance Reviews, Exhibit 1.

deposited it into his bank account—despite previously indicating a check would be mailed to him, should he choose to accept these terms.

104.     Boston Beer's retaliatory acts against Mr. Brennan did not stop with his wrongful termination.

105.     After terminating Mr. Brennan, Boston Beer made it clear to Mr. Brennan that Boston Beer intended to enforce a non-compete agreement, if he attempted to sell beer or hard cider for at least one year following his termination.

106.     When Mr. Brennan was terminated by Boston Beer, his annual salary was approximately $55,000.00, and he was assigned to cover accounts in Manchester, New Hampshire and half of Nashua, New Hampshire. Throughout his entire employment with Boston Beer, Mr. Brennan was only assigned to cover accounts in New Hampshire.

107.     After Boston Beer terminated Mr. Brennan, Mr. Brennan secured a new position at Lone Pine Brewing Company ("Lone Pine"), based in Portland, Maine.

108.     The Lone Pine position was a promotion for Mr. Brennan, offering a starting salary of $65,000.00—which equated to a salary increase of approximately $10,000.00.

109.     The Lone Pine position also offered a more robust bonus structure; Mr. Brennan was informed by Lone Pine that if his performance was strong, he could anticipate making over $100,000.00 annually.

110.     Inclusive of his annual bonus, Mr. Brennan's take home pay from Boston Beer in 2021 was only $67,000.00.

111.     Bonuses at Boston Beer are calculated by what the company calls its "X Factor." Boston Beer does not disclose the criteria that factor into the "X factor," but the company's

employees believe they are heavily based on the company's overall performance and each individual manager's subjective review of the employees on his/her team.

112.　　The Lone Pine position also offered Mr. Brennan more managerial responsibilities and the opportunity to work for a Maine-based company and cover a completely new territory—the entire state of Vermont and upstate New York—which Mr. Brennan did not cover at any time he was employed by Boston Beer.

113.　　As an act of further retaliation, Boston Beer called Lone Pine to investigate whether Mr. Brennan was working there.

114.　　Once Boston Beer had confirmed that Mr. Brennan had taken a new position, several senior executives from Boston Beer called Lone Pine, threatening to pursue litigation if Lone Pine continued to employ Mr. Brennan.

115.　　After several Boston Beer executives and legal representatives contacted Lone Pine threatening to enforce a non-compete agreement with Mr. Brennan, Lone Pine issued the below letter to Mr. Brennan terminating his employment as a direct result of the non-compete agreement:



John Brennan

Manchester, NH 03103

July 21, 2022

Dear John,

We are writing to follow up on our discussion of your non-competition agreement with your previous employer Boston Beer. When you first applied for a position with Lone Pine, you disclosed that you had a non-compete and stated that you were in the process of working through some issues with Boston Beer. We told you that we could not employ you until those issues were resolved. Several weeks later, you represented that the non-competition agreement was no longer an issue. Based upon that representation, we hired you on June 20, 2022.

Subsequently, on June 28, 2022, we received a phone call from someone in HR at Boston Beer who asked if we had hired you and if we were aware that you had a non-compete. Our attorney followed up and contacted your attorney, Boston Beer's in-house legal counsel, and Boston Beer's outside legal counsel. Based upon that follow up, it is our understanding that you have an enforceable non-compete agreement with Boston Beer, that your attorney has taken the position that the agreement is not enforceable, and that Boston Beer disagrees with that position and intends to enforce the agreement.

Based upon the current situation, we have decided to terminate your employment with Lone Pine effective July 21, 2022.

You will receive your final paycheck for your last week of work via direct deposit on August 5, 2022. You will also receive a COBRA Continuation Notice notifying you of your right to continue your benefits. Please return all company property to Lone Pine as soon as possible.

Sincerely,

Peter Eiermann
Lone Pine Brewing Company

116.     Under threat of litigation and a direct result of Boston Beer's enforcement of the non-compete agreement, Mr. Brennan was terminated by Lone Pine.

117.     After Mr. Brennan was terminated from Lone Pine, Mr. Brennan remained unemployed for over three months and was forced to find employment in an entirely different industry thereafter.

**Boston Beer wields its non-compete agreement as a weapon against employees to prevent them from working for competitors, thereby suppressing wages throughout the industry.**

118.     Previously, another former Boston Beer employee who was employed as a "Senior Brewery Representative"—the exact same position Ms. Fritts and Mr. Brennan held—was hired by Lone Pine less than twelve months after he voluntarily resigned from Boston Beer.

119.     Despite knowledge of this, Boston Beer did not attempt to enforce its non-compete agreement against this former employee—further evincing Boston Beer wields its invalid non-compete agreement as a weapon to enforce against former employees, including Ms. Fritts and Mr. Brennan, as an act of retaliation for exposing Boston Beer's illegal acts and bad actors at the company.

120.     Dating back to at least 2011, Boston Beer has required its sales representatives to sign non-compete agreements as a condition of employment.

121.     Boston Beer has also continued to acquire "craft breweries;" as a condition of employment, Boston Beer requires all new hires to sign the same non-compete agreement—regardless of the employee's position or state of residence.

122.     By way of example, when Boston Beer acquired Dogfish in 2019, the sales representatives that were onboarded from Dogfish were required to sign a noncompete agreement in order to be employed by Boston Beer.

123.     Upon information and belief, approximately 30% of Dogfish's workforce refused to sign the non-compete agreement and chose to find employment elsewhere.

124.     As recently as October 2023, Boston Beer filed a lawsuit against a former employee, Brian Soudant, and his new employer, Downeast Cider House, LLC.

125.     The Soudant complaint stated the founder of Boston Beer, Jim Koch, personally and intentionally "reached out" to the owner of Downeast Cider to warn him Mr. Soudant was subject to a non-compete agreement with Boston Beer, which Boston Beer intended to enforce against Soudant and Downeast Cider.

126.     Upon information and belief, Mr. Soudant was terminated from Downeast Cider thereafter.

127.     Boston Beer subsequently dismissed its lawsuit against both Mr. Soudant and Downeast shortly after filing suit.

### Boston Beer's non-compete agreements are unreasonable, unconscionable, and unenforceable under Massachusetts law.

128.     Boston Beer's non-compete agreements are substantively unconscionable and constitute an impermissible restraint on trade.

129.     Massachusetts has evinced a desire to avoid onerous and excessive non-compete agreements. *See* MASS. GEN. LAWS ch. 149, § 24L ("Massachusetts Noncompetition Agreement Act").

130.     Pursuant to Massachusetts law, such clauses must be premised on a legitimate business interest and must be narrowly tailored in terms of time, activity, and place. *Id.*

131.     Massachusetts law also recognizes that the unreasonable restraint of trade or commerce by contract is an offense against state law and public policy. *Id.*

132.     The Act instructs non-compete agreements "shall be supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee, provided that such consideration is specified in the noncompetition agreement." *Id.*

133.     "To constitute garden leave . . . the agreement must (i) provide for the payment, consistent with the requirements for the payment of wages . . . on a pro-rata basis during the entirety of the restricted period, of at least 50 percent of the employee's highest annualized base salary paid by the employer within the 2 years preceding the employee's termination . . ." *Id.*

134.     Noncompetition agreements are <u>not</u> enforceable against employees that have been terminated without cause or laid off. *Id.*

135.     Boston Beer's non-compete agreements are neither supported by a legitimate business interest nor narrowly tailored. Where, as here, such agreements are unreasonable, the societal harms are magnified.

136.     Boston Beer has no legitimate business interest that can justify the use of a non-compete agreement for its sales representatives.

137.     Boston Beer's sales representatives do not hold or acquire trade secrets or other confidential proprietary information; and—even if, *arguendo*, they did—such information would be separately protected by the confidentiality agreement they signed.

138.     Ms. Fritts and Mr. Brennan were not provided with adequate consideration for execution of the non-compete agreement. They were not offered sufficient monetary payment or guaranteed employment for a specified period of time in return for execution of the non-compete agreement.

139.     The non-compete agreement enforced against Ms. Fritts and Mr. Brennan was not narrowly tailored and contained no geographic limits; it was, therefore, unreasonable, unconscionable, and unenforceable as a matter of law.

140.     Furthermore, Ms. Fritts' and Mr. Brennan's Employment Agreement with Boston Beer contained separate non-solicitation, confidentiality, and non-disparagement—further evincing the Agreement's restrictions were not narrowly tailored nor designed to protect a legitimate business interest.[3]

141.     Non-compete agreements significantly disrupt the labor market, as they have a chilling effect on the efforts of employees to seek continued employment in a field in which they have gained familiarity. Such clauses also have a chilling effect on the ability of businesses, such as Lone Pine, Anchorsteam, and Downeast, to freely hire workers, by potentially subjecting these businesses to litigation, and by limiting the pool of available workers.

142.     The use of non-compete agreements for at-will sales representatives, like Ms. Fritts and Mr. Brennan, limits the ability of employees to find new employment; limits the ability of employees to move to a new state and find employment where Boston Beer sells its products; hinders the upward mobility of workers looking for higher wages or advancement with new employment using skills obtained in their current employment; and suppresses wages for employees who have limited negotiating power with both current and potential new employers when they are limited by a non-compete agreement.

---

[3] *See* M.G.L. c. 149, § 24L (b) (iii): "The agreement must be no broader than necessary to protect one or more of the following legitimate business interests of the employer: (A) the employer's trade secrets; (B) the employer's confidential information that otherwise would not qualify as a trade secret; or (C) the employer's goodwill. A noncompetition agreement may be presumed necessary where the legitimate business interest cannot be adequately protected through an alternative restrictive covenant, including but not limited to a non-solicitation agreement or a non-disclosure or confidentiality agreement."

143.     This suppression of wages and hindrance on mobility impacts trade and commerce throughout Massachusetts, and beyond.

144.     Accordingly, Boston Beer has engaged in unfair conduct in violation of the Massachusetts Noncompetition Agreement Act by requiring its current and former employees to sign unenforceable non-compete agreements without consideration, without a legitimate business reason, and without narrowly tailoring the agreements to protect any purported confidential or trade secret information.

145.     To the extent that Boston Beer knows it will not—and *cannot*—enforce the terms of its non-compete agreement but has failed to inform Ms. Fritts and Mr. Brennan and the company's other current and former employees of such information, Boston Beer has omitted material information.

146.     Information that their executed non-compete agreements would not be enforced by Boston Beer would be material to its current and former employees, who Boston Beer has made to believe are bound by them.

147.     By failing to inform current and former employees of this material fact, Boston Beer has also engaged in deceptive conduct in violation of Massachusetts' Consumer Protection Act (M.G.L. c. 93A § 11).

148.     Consumers benefit from competition among employers because a more competitive workforce will create more and higher quality goods and services.

149.     In recognition of this, in January 2023, the Federal Trade Commission (FTC) "proposed a new rule that would ban employers from imposing noncompetes on their workers, a

widespread and often exploitative practice that suppresses wages, hampers innovation, and blocks entrepreneurs from starting new businesses."[4]

150.     The FTC estimates outlawing non-compete agreements "could increase wages by nearly $300 billion per year and expand career opportunities for about 30 million Americans." *Id.*

151.     In September 2023, the Department of Labor (DOL) joined the FTC in its efforts to ban non-compete agreements, signing an agreement intended to "bolster the FTC's efforts to protect workers by promoting competitive U.S. labor markets and putting an end to unfair, deceptive, and other unlawful acts and practices, as well as unfair methods of competition, that harm workers."[5]

## **CAUSES OF ACTION**

### **Intentional Discrimination**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.)**
*On behalf of Plaintiffs Ms. Fritts and Mr. Brennan vs. Defendant Boston Beer Company*

152.     Plaintiffs incorporate the preceding paragraphs as alleged above.

153.     Plaintiffs have timely filed charges with the EEOC and have thus exhausted their administrative remedies.

154.     Boston Beer has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its female sales representatives. Boston Beer has intentionally discriminated against Ms. Fritts in violation of Title VII by, among other things:

---

[4] "FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition" (last accessed March 4, 2024) available at: https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition.

[5] "FTC, Department of Labor Partner to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices" (last accessed March 4, 2024) available at: https://www.ftc.gov/news-events/news/press-releases/2023/09/ftc-department-labor-partner-protect-workers-anticompetitive-unfair-deceptive-practices.

- Utilizing a biased performance system;

- Utilizing a biased compensation system;

- Utilizing a biased promotion system;

- Systematically and intentionally undervaluing female employees' aptitude and performance; and

- Failing and refusing to take reasonable and adequate steps to prevent and correct the use of standardless, unvalidated, and/or illegitimate criteria to determine the terms and conditions of employment.

155. These company-wide policies are intended to and do have the effect of:

- Denying female employees, including Ms. Fritts, business opportunities because of their gender;

- Compensating female employees, including Ms. Fritts, less because of their gender;

- Failing to promote female employees, including Ms. Fritts, because of their gender;

- Evaluating the performance of female employees, including Ms. Fritts, more negatively because of their gender;

156. The discriminatory acts that constitute Boston Beer's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

157. As a direct result of Boston Beer's discriminatory policies and/or practices as described above, Ms. Fritts and other current and former female employees have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

158. Plaintiffs request relief as hereinafter described.

**Retaliation**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.)**
*On behalf of Plaintiffs Ms. Fritts and Mr. Brennan vs. Defendant Boston Beer Company*

159.     Plaintiffs incorporate the preceding paragraphs as alleged above.

160.     Plaintiffs have timely filed charges with the EEOC and MCAD alleging retaliation claims and have thus exhausted their administrative remedies.

161.     Plaintiffs engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC and MCAD complaining of Boston Beer's discriminatory policies and practices.

162.     Boston Beer took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, and Plaintiffs suffered damages as a result of that conduct.

163.     Boston Beer also retaliated against Plaintiffs post-employment by enforcing a knowingly invalid noncompetition agreement against Ms. Fritts and Mr. Brennan.

164.     Plaintiffs request relief as hereinafter described.

**Invalid Noncompetition Agreement**
**M.G.L. c. 149, § 24L**
*On behalf of Plaintiffs Ms. Fritts and Mr. Brennan vs. Defendant Boston Beer Company*

165.     Plaintiffs incorporate the preceding paragraphs as alleged above.

166.      Boston Beer has enforced, and continues to enforce, an illegal noncompetition agreement against Ms. Fritts and Mr. Brennan in acts of retaliation that is not consonant with public policy.

167.     Boston Beer enforced, and continues to enforce, an invalid noncompetition agreement against Ms. Fritts and Mr. Brennan that is overly broad to protect any legitimate business interest of the employer.

168.     Boston Beer enforced, and continues to enforce, an invalid noncompetition agreement against Ms. Fritts and Mr. Brennan that was unreasonable in geographic scope to legitimately protect any interest of the employer.

169.     Boston Beer enforced, and continues to enforce, an invalid noncompetition agreement against Ms. Fritts and Mr. Brennan that was unreasonable in its scope of restricted activities.

170.     WHEREFORE, Complainant Katie Fritts demands judgment against listed Defendants, BBC, and its agents, in an amount to be determined at trial, plus interest, cost, and attorneys' fees where applicable.

### Tortious Interference with Contract & Business Relations
*On behalf of Plaintiff Mr. Brennan vs. Defendant Boston Beer Company*

171.     Plaintiffs incorporate the preceding paragraphs as alleged above.

172.     A plaintiff bringing a claim of tortious interference with contract and business relations relationship must prove that: (1) he had a contract/business relations with a third party; (2) the defendant knowingly interfered with that contract/business relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

173.     Plaintiffs state: (1) Boston Beer knew Mr. Brennan had entered into a new employment contract and business relations with Lone Pine; (2) Boston Beer interfered with Mr. Brennan's employment contract and business relations with Lone Pine by contacting Lone Pine's owner and legal counsel, threatening to enforce a non-compete agreement against Mr. Brennan and Lone Pine; (3) Boston Beer's interference was intentional and improper, as it was an act of further retaliation against Mr. Brennan—evidenced by Boston Beer's previous decision to refrain from enforcing the non-compete clause against another former employee hired by Lone Pine less

than one year after he left Boston Beer; and (4) Mr. Brennan was harmed by Boston Beer's retaliatory acts because Lone Pine terminated him, causing Mr. Brennan to lose his employment for over three months and requiring him to seek employment in an entirely different industry, thereby sacrificing career prospects in the brewery industry.

174.    The non-compete clause of the Employment Agreement Boston Beer sought to enforce against Mr. Brennan and Lone Pine was unlawful and unenforceable under M.G.L. c. 149, § 24L for at least the following reasons:

- The non-compete clause was not narrowly tailored by scope or geography—Mr. Brennan was hired by Lone Pine to work in a different geographic territory (Vermont and upstate New York) than he was assigned while working for Boston Beer (Manchester. New Hampshire and half of Nashua, New Hampshire);

- Mr. Brennan was assigned different job functions and managerial tasks by Lone Pine that he was never assigned by Boston Beer;

- Mr. Brennan was wrongfully terminated by Boston Beer;

- Mr. Brennan did not sign a new non-compete agreement with Boston Beer after he was promoted to "Senior Brewery Representative" and his role within the company materially changed, as required by law per the "material change doctrine;"

- Mr. Brennan was not provided garden variety leave, or adequate consideration by Boston Beer; and

- Boston Beer's non-compete agreement was not consonant with public policy.

175.    Boston Beer knew of the existence of a contract and business relationship between Mr. Brennan and Lone Pine—evidenced by the fact Boston Beer's executive-level employees and legal counsel corresponded with Lone Pine on numerous occasions.

176. These correspondences were intentionally sent by Boston Beer with the improper motive of inducing Lone Pine, a Maine corporation, to terminate its contract and business relations with Mr. Brennan.

177. As a direct consequence of Boston Beer's actions, Mr. Brennan was terminated by Lone Pine, thereby depriving him of his employment and other tangible and intangible rights.

178. Plaintiffs incorporate the preceding paragraphs as alleged above.

**Breach of Contract**
***On behalf of Plaintiffs Ms. Fritts and Mr. Brennan vs. Defendant Boston Beer Company***

179. Plaintiffs incorporate the preceding paragraphs as alleged above.

180. Boston Beer entered into written contracts with Ms. Fritts and Mr. Brennan.

181. Boston Beer knowingly enforced an invalid non-compete agreement against Ms. Fritts and Mr. Brennan in bad faith with the expectation that they would simply comply and not argue the legal validity of his Employment Agreement.

182. Boston Beer in bad faith drafted its non-compete agreement, contained within Ms. Fritts' and Mr. Brennan's Employment Agreement, to be overly broad as to the scope, geography, and time period in which it restricted its employees, including Ms. Fritts and Mr. Brennan, in hopes they could stifle competition in the brewery industry.

183. Plaintiffs incorporate the preceding paragraphs as alleged above.

**Breach of Implied Covenant of Good Faith and Fair Dealing**
***On behalf of Plaintiffs Ms. Fritts and Mr. Brennan vs. Defendant Boston Beer Company***

184. Plaintiffs incorporate the preceding paragraphs as alleged above.

185. Boston Beer entered into written contracts with Ms. Fritts and Mr. Brennan.

186. Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.

187.     The covenant provides that neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract.

188.     Through its actions as stated herein, Boston Beer acted in bad faith and breached the implied covenant of good faith and fair dealing through its wrongful conduct to Ms. Fritts and Mr. Brennan, as stated herein.

189.     Plaintiffs incorporate the preceding paragraphs as alleged above.

## Unjust Enrichment
### On behalf of Plaintiffs Ms. Fritts and Mr. Brennan vs. Defendant Boston Beer Company

190.     Plaintiffs incorporate the preceding paragraphs as alleged above.

191.     Boston Beer has been unjustly enriched at Ms. Fritts' and Mr. Brennan's expense.

192.     Boston Beer has received significant financial benefits through its wrongful acts stated herein, and Ms. Fritts and Mr. Brennan have lost financial expectations.

193.     Boston Beer has no valid legal or equitable claim to the financial benefits it has derived from its wrongful acts. It would be inequitable for Boston Beer to retain such benefits.

194.     Accordingly, Boston Beer is entitled to an award equal to the amount of Boston Beer's unjust enrichment so as to divest the inequitable benefits from Boston Beer and return them to Ms. Fritts and Mr. Brennan.

195.     Plaintiffs incorporate the preceding paragraphs as alleged above.

## Violations of the Massachusetts Consumer Protection Act (M.G.L. c. 93A § 11)
### On behalf of Plaintiffs Ms. Fritts and Mr. Brennan vs. Defendant Boston Beer Company

196.     Plaintiffs incorporate the preceding paragraphs as alleged above.

197.     Boston Beer engaged in unfair and deceptive acts and practices in violation of M.G.L. c. 93A § 11, Massachusetts' Consumer Protection Act.

198.     At all times relevant hereto, Boston Beer was engaged in trade and commerce in the Commonwealth of Massachusetts including in and through its relationship with Ms. Fritts and Mr. Brennan.

199.     Boston Beer engaged in unfair and deceptive conduct in the course of its dealings with Ms. Fritts and Mr. Brennan, including but not limited to breaching its contract with Ms. Fritts and Mr. Brennan and the covenant of good faith and fair dealing to obtain a pecuniary benefit at Ms. Fritts' and Mr. Brennan's expense.

200.     Boston Beer's unfair and deceptive conduct was knowing and willful.

201.     Ms. Fritts and Mr. Brennan suffered damages and lost money as a result of Boston Beer's unfair and deceptive conduct.

202.     Pursuant to Massachusetts law, a contract terminated in bad faith may provide the basis for a valid claim under c. 93A.

203.     Plaintiffs incorporate the preceding paragraphs as alleged above.

## PRAYER FOR RELIEF AND JURY DEMAND

204.     Based on the foregoing causes of action, Plaintiffs demand judgment against Defendants in an amount to be determined in a trial by jury; for a sum that will fully and fairly compensate Plaintiffs for their injuries and conscious pain and suffering, that Plaintiff recovers actual damages; that Plaintiffs are entitled to recover compensatory damages; that Plaintiffs recover punitive damages; that Plaintiffs recover treble damages pursuant to Defendant's willful violation of M.G.L. c. 93A § 11, together with litigation costs, expenses and reasonable and necessary attorneys' fees; that Plaintiffs recover pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and any and all other relief to which Plaintiff may be justly entitled.

205.    Plaintiffs demand a trial by jury on all issues so triable.

DATED: March 4, 2024

                              Respectfully Submitted,

                              _____
                              Ashley M. Pileika
                              Massachusetts State Bar No. 709954
                              Darren R. Wolf*
                              Texas State Bar No. 24072430
                              **Law Office of Darren Wolf, P.C.**
                              1701 N. Market St., Suite 210
                              Dallas, Texas 75202
                              P:  214-346-5355 | F: 214-346-5909
                              ashley@darrenwolf.com
                              darren@darrenwolf.com
                              *Pro hac vice application forthcoming*